UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CHARTER COMMUNICATIONS, L.L.C., ) | |
| ) | |
| Plaintiff(s), ) | |
| ) | |
| vs. ) | Case No. 4:05CV328 JCH |
| ) | |
| CHRISTINA C. MOSCA, ) | |
| ) | |
| Defendant(s). ) | |

# MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Charter Communications, L.L.C.'s Motion for Preliminary Injunction, filed February 22, 2005. A hearing on this matter was held on July 13, 2005. The matter is now fully briefed and ready for disposition.

# BACKGROUND

By way of background, Plaintiff Charter Communications, L.L.C. ("Charter") is a limited liability company, duly organized and existing under the laws of the State of Delaware. (First Amended Petition ("Complaint" or "Compl."), ¶ 1). Charter is a subsidiary of Charter Communications, Inc., and has its headquarters and principal place of business in St. Louis County, Missouri. (Id.).

Defendant Christina Mosca ("Mosca"), a resident of the State of Alabama, formerly worked for Charter as a "Government Relations Manager I." (Compl., ¶¶ 2, 5).[1] In that capacity, Mosca was responsible for, among other things, communications with franchisees within her area of responsibility, franchise agreement audit and compliance reviews, and franchise renewals for those

---

[1] Mosca's position with Charter was her first in the cable industry; she had no prior experience in or knowledge of the cable industry in general, or Charter's operations in particular. (Charter Communications, L.L.C.'s Pre-Hearing Memorandum in Support of its Motion for a Preliminary Injunction ("Charter's First Memo in Support"), P. 2).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

franchisees. (Id.). In connection with her position, Mosca would at times consult with Charter's in-house counsel regarding the language of particular franchise renewals. (Preliminary Injunction Hearing Testimony of Christina Mosca ("Mosca Testimony")).[2] She further attended weekly management meetings for senior staff, in which they discussed issues such as customer numbers, budgets, marketing, human resources, franchises, public relations events, and changes/upgrades on cable lines. (Mosca Testimony).[3]

During her employment with Charter, Mosca worked on franchise renewals within the State of Alabama, and in particular, on the renewal of the franchise agreement with the City of Talladega, Alabama. (Compl., ¶ 5). Mosca further worked on matters concerning franchise agreements with both Walker County, and the City of Opelika, Alabama. (Id.). In 2004, Mosca conducted franchise fee audits[4] of these three entities, along with almost 100 other Charter cable franchisees in the State of Alabama. (Charter's First Memo in Support, P. 3). According to Charter, this process involved, "determining what the terms of the cable franchise agreements provided, how they had been

---

[2] Mr. Hunt Brown, Charter's Vice-President and Senior Counsel for Legal Operations, testified that he worked with Government Relations Managers on interpreting franchise agreements, the Cable Act, and relevant state laws. (Preliminary Injunction Hearing Testimony of Hunt Brown ("Brown Testimony")).

[3] Mr. Don Karell, Charter's Vice-President and Senior General Manager for the Alabama Key Market Area, testified that as a result of her position, Mosca had access to confidential information, including: marketing and rate strategy; customer service strategy; capital investment strategy; budgets and business plans; privileged communications with inside and outside counsel; franchise fee audits; and Charter's method of interpreting franchise agreements. (Preliminary Injunction Hearing Testimony of Don Karell). Mr. Karell further testified that the majority of the above strategies and information has not changed since Mosca left her employment with Charter in 2004. (Id.).

[4] A franchise fee audit is a process by which an auditor examines Charter's method of calculating the franchise fee, and then compares the actual practice to the wording in the franchise agreement. (Charter's First Memo in Support, P. 3 n. 1).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

interpreted and applied, and whether any other additional monies were due either Charter or the franchise authority." (Id., PP. 3-4).[5]

In June, 2004, Mosca attended a three day training program for Charter employees in her position, known as "Charter Franchise University." (Mosca Testimony). While there, she learned how to deal with commonly requested modifications to franchise agreements, what is and is not included in "gross revenues" for purposes of franchise fees[6], and which requested terms are "deal breakers" in terms of franchise renewals. (Id.).[7] As part of her training, Mosca received a copy of the Franchise University Cable Franchise Handbook, which included instructions for negotiating key franchise provisions such as liquidated damages, late fees, franchise term, service area density, interconnects, transfers, indemnification, and insurance. (Charter Communications, L.L.C.'s Post-Hearing Memorandum in Support of its Motion for Preliminary Injunction, PP. 3-4). The contents of the handbook were clearly marked "Confidential and Proprietary." (Mosca Testimony; see also Charter's Preliminary Injunction Exh. 22).[8]

---

[5] Mosca admits that the results of this internal audit constituted confidential or proprietary information, but testified that she does not remember the results of the 2004 audit she performed. (Defendant's Post-Preliminary Injunction Hearing Brief, P. 1; Mosca Testimony).

[6] A franchise fee is an assessment imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber. (Charter's First Memo in Support, P. 3 n. 1, citing 47 U.S.C. § 542(g)). The amount of the fee is governed by the terms of the franchise agreement, but may not exceed five percent of the cable company's gross revenues. (Id., citing 47 U.S.C. § 542(b)). The fee amount is the subject of negotiation between Charter and the franchisee, and a key variable in its determination is the definition of "gross revenue." (Id.). A cable provider has some flexibility in how it defines "gross revenue," and thus retains some control over the amount it pays in franchise fees. (Id.).

[7] Hunt Brown testified that the information presented at Franchise University regarding Charter's preferred practices on circumstances that might arise was not publicized outside Charter. (Brown Testimony).

[8] In her deposition, Mosca testified that in spite of the "Confidential and Proprietary" label, she would not hesitate to use the information contained in the handbook. (Mosca Depo., PP. 261-62).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Mosca's employment with Charter was terminated in the summer of 2004. (Compl., ¶ 8). In connection with her separation from employment, Mosca executed and entered into a Separation Agreement And Release (the "Agreement") with Charter on or about July 23, 2004. (Id., citing attached Exh. A). The Agreement contained the following relevant provisions:

> *(i)* <u>Confidential and Proprietary Information:</u> I acknowledge and agree that, in the course of my employment with the Company, I may have learned about Confidential and Proprietary Information (defined below) of the Company under a relationship of trust and confidence and with the understanding that this information shall be maintained in confidence. "Confidential and Proprietary Information" means confidential and/or proprietary information or trade secrets of or relating to the Company (and includes information the disclosure of which might be harmful to the Company), including but not limited to information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets, but does not include information generally known in the marketplace. In addition, Confidential and Proprietary Information includes information of another company given to the Company with the understanding that the Company and its employees will keep this information confidential. (For example, another company may disclose its own confidential information to the Company in the instance of a potential acquisition or other business transaction). I agree that all Confidential and Proprietary Information described herein is and constitutes trade secret information (regardless of whether the same is legally determined to be a trade secret) and is the exclusive property of the Company. I promise and agree that I will never directly or indirectly disclose, reveal or divulge any Confidential and Proprietary Information to any other person or entity, nor use any of such information for any personal or business purpose.
>
> *(f)* <u>Non-Disparagement:</u> I agree to conduct myself in a professional and positive manner in all of my dealings, communications and contacts concerning the Company, my employment, or my separation from employment. I agree not to criticize, denigrate, disparage, or make any derogatory statements about the Company. In particular, I agree not to make any derogatory statements about

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the Company (including any subsidiaries, or affiliates), its business plans, policies and practices, or about any of its officers, employees or former officers or employees, to customers, competitors, suppliers, employees, former employees, members of the public, members of the media, or any other person, nor shall I harm or in any way adversely affect the reputation and goodwill of the Company. I also agree not to damage any Company property or harm the Company in any way, including financially. Nothing in this paragraph shall prevent me from giving truthful testimony or information to law enforcement entities, administrative agencies or courts or in any other legal proceedings as required by law, including, but not limited to, assisting in an investigation or proceeding brought by any governmental or regulatory body or official related to alleged violations of any law relating to fraud or any rule or regulation of the Securities and Exchange Commission.

*(j)* *Non-Solicitation:* During the one (1) year period after I sign this Agreement, I will not directly or indirectly recruit any employee with whom I worked or directly or indirectly supervised during my Company employment (other than any secretarial, clerical or custodial employees) to work for another company or business; nor will I assist anyone else in recruiting or hiring any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company to engage in a business activity in competition with the Company.[9] During this same one (1) year time period, I also will not directly or indirectly (i) solicit or encourage any customer or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer from the Company; or (ii) take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company. These provisions shall be fully enforceable to the fullest extent permitted by applicable law in such circumstances.

(Compl., attached Exh. A, ¶¶ i, f, j).

Upon leaving her employment with Charter, Mosca began offering her services as a "cable consultant" to cities in Alabama. (Mosca Testimony). To date, Mosca has been engaged by the City of Talladega, Alabama, and Walker County, Alabama, to provide advice and assistance to those governmental entities in connection with the renewal of their franchise agreements with Charter

---

[9] In its Motion for Preliminary Injunction, Charter acknowledges it has no evidence Mosca has violated this portion of Paragraph (j). (Id., ¶ 16).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Communications affiliates. (Compl., ¶ 16).[10] Mosca has been hired by the City of Opelika, Alabama, in connection with an audit of franchise fees under Charter's franchise agreement with that city. (Charter's Motion for Preliminary Injunction, ¶ 10; see also Mosca Testimony). Mosca further has solicited numerous other governmental entities with whom Charter Communications affiliates have franchise agreements, offering to consult with and provide them advice and assistance regarding their franchise agreements. (Compl., ¶ 19).

Charter filed its Complaint against Mosca in Missouri State Court on or about February 14, 2005. In its Complaint, Charter alleges that in the course of her post-Charter employment, Mosca has violated several terms of the Agreement. (Compl., ¶¶ 11-25). Charter thus seeks both damages and injunctive relief against Mosca. With respect to injunctive relief, Charter requests that the Court enter an Order, "prohibiting Defendant and all persons acting by, through or in connection with her, from (i) using or disclosing any Confidential and Proprietary Information as defined in the Agreement, (ii) providing any services to or working for any governmental entity with whom Charter or one of its affiliates has a franchise agreement, or (iii) otherwise violating the terms of the Agreement." (Charter's Motion for Preliminary Injunction, P. 6). Mosca removed the action to this Court on February 22, 2005. (Doc. No. 1).

**DISCUSSION**

The Eighth Circuit has held that, "[i]n deciding a motion for a preliminary injunction, a district court balances four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." Watkins Inc. v. Lewis,

---

[10] Mosca acknowledges she occupies a unique position within the public, as a cable consultant, to recommend to a city the particular terms under which a renewal should take place. (Answer, ¶ 20).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

346 F.3d 841, 844 (8th Cir. 2003), citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." Watkins, 346 F.3d at 844 (internal citations omitted). "The primary function of a preliminary injunction is to preserve status quo until, upon final hearing, a court may grant full effective relief." Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 490 (8th Cir. 1993) (internal quotations and citations omitted).

Upon consideration of the foregoing standards, this Court will grant Plaintiff's request for a preliminary injunction. Specifically, the Court finds that on the record before it, Plaintiff has successfully demonstrated a likelihood it will succeed on the merits. See Missouri Republican Party v. Lamb, 87 F.Supp.2d 912, 915 (E.D. Mo. 2000) ("...the probability that the movant will succeed on the merits is generally regarded as the most important factor of the *Dataphase* test,..."). First, the Court finds that in sending correspondence containing critical and disparaging statements about Charter to Charter employees and cities with whom Charter has a franchise relationship, Plaintiff has already violated the non-disparagement provision of the Agreement. (See Charter Preliminary Injunction Exh. 18). Further, based on the testimony and evidence presented at the preliminary injunction hearing, the Court finds Mosca inevitably will utilize confidential and proprietary information she acquired while employed by Charter in the performance of her present consulting work for Charter franchisees, in that she is advising those entities on matters relating directly to their franchise relationships with Charter affiliates. Such use would violate the non-disclosure provision of the Agreement, and further may lead to a violation of the non-solicitation provision, as Mosca would be in a position to recommend whether or not each governmental entity should continue its business relationship with Charter and/or one of its affiliates, and on what particular terms.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

With respect to the other factors the Court must consider, the Court finds Charter has successfully demonstrated Mosca's actions pose the threat of irreparable harm to Charter, both in terms of reduced bargaining power in negotiations with cities Mosca represents[11], and damage to Charter's reputation and good will in those franchise communities. Further, the Court finds the balance between that harm and the harm the requested relief would cause to Mosca favors the entry of injunctive relief, as there exist numerous other opportunities for Mosca to pursue her cable consulting work, without soliciting cities currently holding a Charter franchise. Finally, the public interest weighs in favor of holding Mosca to the terms of the Agreement she voluntarily signed upon the termination of her employment with Charter.

Based on the foregoing, the Court will enter a preliminary injunction in this matter, in order to preserve the issues in the Complaint for decision by this Court upon final hearing on Charter's request for a permanent injunction.[12]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Charter Communications, L.L.C.'s Motion for Preliminary Injunction (filed February 22, 2005) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Mosca and all persons acting in concert with, acting through, or acting on behalf of Mosca are hereby prohibited, enjoined and restrained from engaging in any of the following until there is a hearing on a permanent injunction:

---

[11] Such reduced bargaining power would result from Mosca's revelation and/or use against Charter of privileged communications, trade secrets, and confidential proprietary information.

[12] The Court emphasizes the nature of its relief is temporary. In other words, while Charter has met its burden with respect to Mosca's present work with the cities of Talladega and Opelika, Alabama, and with Walker County, Alabama, coming as it does so soon after Mosca's exposure to Charter's proprietary information and involvement with the very cities at issue, the Court questions whether such broad injunctive relief would be appropriate on a permanent basis.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(i)     Using or disclosing any Confidential And Proprietary Information or trade secrets of or relating to Charter, consisting of: information concerning Charter personnel, non-published financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, results of internal analyses, computer programs and programming information, techniques and designs, information concerning Charter's negotiating strategy, pricing strategies, and business plans for providing services, and information concerning plans, advice, recommendations and strategies for negotiating franchise agreements and what terms are or are not acceptable to Charter;

(ii)    Using or disclosing any information or advice provided to Defendant by any attorney representing Charter, or any attorney-client privileged information to which Defendant may have become privy by virtue of her employment with Charter;

(iii)   Providing any services to or working for any governmental entity with whom Charter or one of its affiliates has a franchise agreement, in connection
- 9 -

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

with or with respect to any matters concerning that agreement or the franchise relationship or its renewal;

(iv)    Criticizing, denigrating, disparaging, or making any derogatory statements about Charter (including any subsidiaries, or affiliates), its business plans, policies and practices, or about any of its officers, employees or former officers or employees, to customers, competitors, suppliers, employees, former employees, members of the public, members of the media, or any other person;

(v)    Directly or indirectly soliciting or encouraging any customer or subscriber of Charter to purchase any service or products of a type offered by or competitive with any product or service provided by Charter, or reducing the amount or level of business purchased by such customer from Charter; or taking away or procuring for the benefit of any competitor of Charter, any business of a type provided by or competitive with a product or service offered by Charter.

This Order shall continue in full force and effect until the Court issues a final ruling on the merits of this case.

Dated this <u>1st</u> day of August, 2005.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

PDF created with FinePrint pdfFactory trial version www.pdffactory.com